May it please the Court. For the record, my name is Luther Munford. I'm with the Butler Snow firm in Mississippi. With me at council table is Chris Maddox, also of our firm, and we're here for Franchise Svc of North America. We ask this court to do three things. One is to answer one or more of the certified questions. The second is to reverse the judgment that dismissed the bankruptcy. And the third is to remand so that the bankruptcy can go forward. The purpose of that bankruptcy is to maximize the value of Franchise Svc. Here, Macquarie is using Boquito to minimize that value by wiping out Franchise Svc's most valuable asset, which is its claims against Macquarie itself. The court should reject this tactical gambit and give Franchise Svc the breathing room that the bankruptcy code allows so that it can go forward and stay alive. The reasons for the rule against allowing a creditor to make or enforce a contract with a debtor not to take bankruptcy, there are essentially two reasons, I believe. One that is emphasized in the cases is that Congress had created bankruptcy rights. They are at least recognized in the Constitution, and that to allow creditors to make this kind of arrangement would undermine those rights and would be too frequent. It's been a long time since I've had to think about this, but doesn't the bankruptcy code give creditors the right to file bankruptcy petitions? They used to be called involuntary. So it's not as if creditors wouldn't have a right to file a bankruptcy petition. No, the issue here is whether a creditor can prevent a bankruptcy and block a bankruptcy. Yeah, but you're talking about one creditor is trying to prevent one or not, as the case may be, and then there's other creditors who have the right to file them, right? Well, if they qualify, it has to be an undisputed, liquidated debt in order to file an involuntary petition, and unless those other creditors meet that qualification, they cannot file that. They cannot cause a bankruptcy. But, Your Honor, you put your finger on exactly the second reason why this exists, why this rule against allowing these kind of contracts exists, which is that the bankruptcy involves a lot more than just the two parties. The rights of third parties, other creditors, are also at issue. The Avalon case makes this point precisely. There, a company had agreed, actually in a state court, with a creditor not to take bankruptcy, and they got to federal bankruptcy court, and the federal bankruptcy court said, These third-party creditors weren't a party to that agreement. I'm not enforcing that agreement. They have a valid interest. The idea is you can't let one creditor get a leg up on everybody else by having an agreement with the debtor not to take bankruptcy. Well, I don't think it's a matter of Delaware law. I mean, that's what I used to do for a living. I understand, Your Honor. That was long ago. What is it? Long ago and in another land. This is Judge Jones. Someone's not using the mic. I can't hear. Can you hear the lawyer? I can hear the lawyer. Occasionally I'm having trouble with Judge King. Nothing new there. Judge King, why not move your mic a little closer to the… Let me see. No, it's… Which one is it? Which one is it? Which is our operative mic? Okay. But as a matter of Delaware law, I don't think there's any reason why you can't build this into the charter, is there? Yes, there is. What's your best case on that? The cases that we have on that, there's no direct case. We are here… These cases that prohibit this kind of agreement are federal cases based on federal policy, trying to protect the rights of federal creditors in bankruptcy. But there is a Delaware law issue in this case. And, Your Honor, as the Bankruptcy Court found, there is no… You know, we haven't got a goose case. But the case on the Delaware law is actually quite strong. The principle in Delaware is that if a minority shareholder has control of an important transaction, they have a fiduciary duty to exercise that control in the best interest of the corporation and not use it to gut the corporation and protect themselves. The corporate charter, Mr. Munford… Even… Even minority shareholders, a nice way to put it, they own 49.76% of the equity because they put in $15 million in equity. So I have a lot of trouble with your initial premise that somehow a quarter million dollar unsecured debt is the tail wagging the dog of a prospective $15 million equity loss. They put in $15 million. We, the legacy business, had an equivalent value of, let's say, $15 million in this. The whole deal went under because the deal they structured went bankrupt within six months. And what we're talking about is right now. So, you know, we know you have a lawsuit, but we're not going to prejudge that lawsuit here. We're not asking this court to prejudge that lawsuit. We're asking this court to say they claim a $3 million success fee for that merger, which is more than the entire net worth of this corporation. And the corporation needs bankruptcy to stay alive. Let me just ask a question. When it filed, I don't think we had access to the schedule. How much secured and unsecured debt does the company have? There's approximately $6 million in debt, and very little of it is secured. It's in our reply brief. Okay. So there are other creditors, no question. Well, I didn't doubt that. I just was wondering. And under the Delaware case, Supreme Court case of Con V. Lynch, it recognizes in that case that a 30% shareholder who used the threat, the threat of blocking a cash-out merger through certain corporate rights because it wanted a better deal for itself, that that was a breach of fiduciary duty to the corporation and had to be judged under the entire fairness standard, even though they were a minority shareholder. We've also cited, and it applied to a control of a particular transaction, not control of the corporation. What evidence is there in this case that Boquito Exercises controlled over FSNA's business affairs? What's the evidence of that? The evidence, the question is not control over business affairs in general. It's control over this transaction. The Con V. Lynch case says it's enough if they have control over a particular transaction. That is the same test, and that's the Supreme Court. Are you familiar with Ivanhoe Partners versus Newmont Minnesota Corporation? No, I'm not. That's not in the brief, Your Honor. We'll be happy to submit a letter brief on it. It's a Delaware case that says under Delaware law, shareholder owes fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation. Well, what I'm telling you is this Delaware Supreme Court case called Con V. Lynch, which says control over a particular transaction, a cash-out merger, was sufficient control, even though they didn't control other matters with respect to the corporation. They only had a 30% share. But you're just talking about a theoretical possibility because your board never consulted Boquico, right? I mean, Boquico's response to this is totally theoretical, is it not? No, they filed a motion to dismiss. That doesn't mean that it could have been filed again. I'm sorry? I understood the basis for the motion to dismiss was that the proper corporate formalities were not observed. So if the case is dismissed, the board could convene a meeting, invite Boquico, and observe the proper corporate formalities. I mean, at least it's stated in one of the briefs that it is not a foregone conclusion that Boquico would have stalled out of bankruptcy. Your Honor, the cases we cited in our reply brief say that if the blocking provision is invalid, then you don't have to ask first. You don't have to ask a snake permission to step on its head to keep it from biting you. So those creditor cases under bankruptcy law, under your bankruptcy policy idea, right? Yes, they are. Here, Macquarie is a creditor. Boquico was designed to be a creditor from the very beginning. They just didn't extend the credit because of the... They just wrote a check for $15 million. That's the strangest creditor I've ever seen. I'm sorry, I don't understand the tenor of your question. It was a joke. I said, how many creditors just write a check for $15 million in the company with no strings attached except that when FSNA reorganizes under Delaware law, they say we will have the right to consider liquidation or bankruptcy. That provision does not turn them into a creditor. They are an equity holder. But they also were a creditor, and that's why we're here. Well, let's agree that they're a creditor now. Yes. What would indicate that they were a creditor at the time of the contract or that they were intended to be a creditor at the time of the contract? Two things. Number one, that they had sent us an invoice for $3 billion, which was unpaid, the invoice supposedly being payable for a successful merger, which it certainly wasn't. The second thing is that... The invoice was for what? A fee that they wanted to charge for a, quote, successful merger. And that's evidence that they were a creditor. Yes, because it wasn't paid. Still hadn't been paid. The merger wasn't successful. The other thing is that Boquito, who is the appellant here, was set up to be a creditor. The loan facility was designed... This is really very cleverly constructed. It was a loan of last resort, right? It is found in Exhibit H to Exhibit 9A, otherwise known as Document 121-1, page 120. It's cited correctly in our brief at page 9. It is not the document that's supposed to be in Record Excerpt 7, but I've just given you the correct site. And that is a $7.5 million facility for franchise services, for Boquito to make a loan to franchise services, all in place at the same time that this blocking right was in existence in the shareholder agreement. We say, Judge Jones, the ultimate answer to your question is if the $15 million as a shareholder counts, then they have to act like a shareholder and not like a creditor. They have a duty to the corporation to maximize the value of the corporation and not exercise that right to block the corporation from the recovery that it needs in order to pay all people with a community of interest in the corporation. Let them in all well and good. Had your Board of Directors complied with the corporate formalities, brought the approval of Boquito as required by the Certificate of Incorporation, been denied, and then filed anyway. Judge Jones, that issue was never raised in the Bankruptcy Court. Not once. Well, it's obvious. It was never raised in the Bankruptcy Court. Never. However, this is a regular appeal. It is an appeal involving a certified question, but it's a regular appeal. The regular rules of if you didn't raise it in the court below, you can't raise it on appeal apply. They didn't raise it below, and they never, you know, they didn't raise it below. It's not proper here. And it also wasn't required by law. Are there any further questions? I have only a minute or two. You've got 20 seconds. If not, Your Honor, I will retire and let you hear from closing counsel. Good morning, Your Honors, and may it please the Court. I'm Kevin Marino of Marino, Tortorella, and Boyle. With me at counsel table is my partner, John Tortorella, and our local counsel, Brooks Eason of Baker Donaldson. The public policy that is undeniable, which says you cannot make a deal, creditor and debtor cannot make a deal, pre-petition to not file bankruptcy, has absolutely no applicability whatsoever in this case. Boquito is not a creditor at the time that this deal is struck. And the deal, as Judge Jones indicated, $15 million equity interest for 49.76% of the company. Every case to consider this issue, and there are seven, six bankruptcy cases and one district court on appeal from a bankruptcy court, every single one has drawn the line in this way. If what is actually going on, however cleverly disguised by an astute creditor, by someone, in one of the cases, the phrase cleverly insidious is used, however it's devised, if what's really going on is that a creditor is exercising its right to put itself at the head of the class and make certain that its debt is paid and until it does, there will be no bankruptcy, if that's what's going on, that offends, without any question, the public policy against a pre-petition deal not to file bankruptcy. It has nothing to do with this case. We made a $15 million investment to be an equity holder. The owners of the company, being the insiders, being Boquito, the entity formed for the purpose, and FSNA, sat together and drafted a certificate of incorporation that included a whole lot of rights, one of which was we, as the equity owners of this company, agree that unless we both say we're going to file bankruptcy, there shall be no bankruptcy. Before you make a contribution to an equity entity, before you invest and have, if you'll pardon the colloquial phrase, skin in the game, you have an understanding of how that company is going to operate. Now, Your Honor, Judge Graves, you raised the Ivanhoe case, and counsel said that case is not in the briefs. Actually, the case that counsel referred to, which is the Kahn v. Lynch Communications Systems case from the Delaware Supreme Court, cites Ivanhoe Partners v. Newmont Mining Corp. I beg your pardon, which I believe is the case Your Honor is referring to, for the following proposition. A shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation. The argument that's being made in FSNA here in an attempt to sort of modify the status of Boketo as an equity owner, an investor, the modification is let's say it's not really exercising control over the company that matters. It's, well, you're exercising control over this one decision about whether you'll file bankruptcy. And even that isn't right, because we didn't have and do not have control over bankruptcy. We have the ability to say we want to file bankruptcy, and if FSNA doesn't agree, we don't have a bankruptcy. We can say we don't want to file bankruptcy. If FSNA does, we don't have a bankruptcy. It's not control in any sense of the word, and it's certainly not remotely akin to the type of control a minority shareholder must have in order to be considered a majority shareholder, that is to say to be considered someone who has fiduciary duties. Why is this the case? The cases draw the distinction along the following line, insider on the one hand and outsider on the other. The insiders are those who actually own the company, those who have skin in the game. And the cases are, it could not be clearer, the best case on the subject is the Squire Court case, and it also happens to be a case that was decided. All of these cases, with the exception of one, were decided in the last four years. And the Squire Partners case was decided just last year, July of 2017. In that case, the court said it just like this. Quote, It is one thing to look past corporate governance documents and the structure of a corporation when a creditor has negotiated authority to veto a debtor's decision to file a bankruptcy petition. It is quite another to ignore those documents when the owners retain for themselves the decision whether to file bankruptcy. It is one thing for the courts to overrule a creditor that seeks to block a debtor from filing bankruptcy. It is quite another for the courts to overrule the owners of the entity. And here's another thing that's really quite extraordinary. I listened with something approaching morbid fascination to the idea that Bakito certainly was going to say no to this bankruptcy. Not only is there no record evidence to suggest that that's the case, the evidence in the record is directly to the contrary. Tobias Bachteller, who is a manager of Bakito and a managing director at Macquarie, and everyone knows the relationship between Macquarie and Bakito. Bakito was the special-purpose entity formed for purposes of holding this investment that we were making, the $15 million investment that Judge Jones adverted to. What did Mr. Bachteller say? And this is not... This is directly from his testimony. He said they weren't asked. It was told the day before that there was going to be a bankruptcy. It was a fait accompli. There was no request for consent. And he was asked. At page 32. This is docket 231. Did FISNA ever suggest to you at any time that it was entering into preparatory steps, that is to say, in the words of section 9.1 of its Certificate of Incorporation, taking any, quote, preparatory steps towards or filing a petition for bankruptcy? Answer, no. Question, would it have been possible for Macquarie to infuse more cash into FISNA if it thought that was an appropriate step rather than a bankruptcy? Answer, of course. Question, would it have been possible for Macquarie to engage in negotiations with any secured creditors of FISNA as a way of staving off a bankruptcy? Answer, of course. Question, you were not given the opportunity to consider those options, correct? Correct. Of course he wasn't given the opportunity. Why not? Also in the record, we have Mr. Nash, who is the party that FISNA brings in to oversee this bankruptcy filing. And what does he say? He wasn't even made aware of insider employment agreements that Mr. McDonald had with FISNA. He wasn't made aware that the bankruptcy would have benefited Mr. McDonald. And what I said to him, well, I asked him, is that something he would have known? Answer, well, did you know? I would like to have known. But I didn't, and there it is. Question, why would it make a difference? Answer, had we known about those agreements pre-petition, we might have made different recommendations for how the case was pursued or how the sale process was set up. Had we known post-petition, but before the sale process, sales procedures were filed, we might have made some attempt to have some negotiations with the counterparties. Question, is Mr. McDonald one of those counterparties? Answer, yeah, Mr. McDonald. I asked him also about his expertise in advising debtors as to the wisdom and timing of a petition. I asked him if he had that expertise. Yes, he does. Did you deploy it here? Answer, not in this case, because they didn't ask, right? Answer, that's right. You didn't ask them, okay, you contacted me here on June 21st, I believe you said we're going to have this filing, it's got to be done, boom, boom, boom. It's going to be filed before the end of June, so I've got about a week. Why? I asked him. Quote, who's the wolf at the door? Judge Jones asked, who are the secured creditors? Answer, let me just be clear, I asked debtors' counsel, I didn't ask the board. Who's the secured creditor that forced the case into bankruptcy? Answer, there is no secured creditor. Here's what's going on. In a case of this type, when an equity owner such as Bakita makes an investment on the order of magnitude of $15 million, it could easily say, you know what, we don't want to be involved in the profits and losses. We don't want risk. We don't want to take any distributions. We don't want to have the benefit of tax consequences. We don't want to make a capital contribution. It could say all of those things. We just want to be a creditor. We'll lend you the money, and you pay us back. If that had happened, and as part of the deal, Bakita had said, and by the way, until we're paid back that $15 million, you can't file bankruptcy, that would transgress. That's what's going on here. So this is just a clever re-modification, just a revisionist history about what actually happened. And the cases, and they are, as I say, there are seven cases. The seven cases, all in their essence, although some approve the provision at issue and some reject it, every single one of them abides the same principle. And that principle is when the owners retain the right to not file bankruptcy, that's kosher.  But until I'm repaid, no, no, no on the bankruptcy petition? That's no good. That's not kosher. So, In Re Global Ship Systems decided in 2007, there's a consent right written right in the LLC's operating agreement. That's a Southern District of Georgia bankruptcy case. All of the counterparties to the LLC were creditors of the debtor. The court nevertheless enforces a consent right in the favor of the creditor. Why? Quote, because the main creditor was also a 20% equity holder. The consent right did not expire upon payment of, the company was called Drawbridge, upon payment of Drawbridge's loan. Consent right was dependent solely on the equity holder status, not the creditor status. So too here. And there you have Global Ship Systems enforcing a consent provision that's admittedly enforced on the part of a creditor. Does, if the Delaware law governs this provision, which I would think that it would, aren't there fiduciary duty principles that are applicable here? The fiduciary duty principles that are applicable are as follows. If I'm a controlling shareholder, I owe a fiduciary duty. If I'm an outside director, one of these special directors, one of the things that you see in these cases is a clever device that a debtor and a creditor will employ to try to circumvent this workaround, to try to circumvent the public policy. One of the things you see in these cases is, well, we'll have an outside director. We'll call him an independent director, right? He's a special director. And what the cases say is, fine, if that's what you're doing and you're going to appoint someone else to make those decisions, that person's a director, a blocking director. The Lake Michigan case talks about a playbook, right? It's part of the playbook to have a blocking director be a fiduciary. Of course the outside director has to be a fiduciary because it's not presumed that that individual is going to act in its own best interest. The problem in this case is there was a falling out between FISNA and Macquarie because FISNA has come up with the fanciful notion, and I believe, and Judge Jones indicated there's a lawsuit. We're not going to get to the merits of it. I can't wait to get to the merits of it. I can't wait to have that examined so we can explode the notion that there even should have been a falling out, but there was, and FISNA came to the view that its enemy was its 49.76% partner in this company. So from that moment forward, they want to treat us as a creditor and an enemy creditor. We're not. Not at all. So from a fiduciary duty perspective, we don't have a fiduciary duty as a minority shareholder, but we have self-interest. Of course we're going to do what's in the interest of the company. Why would we not? Why does every single case draw the distinction between insiders and outsiders? For exactly the reason the Court said in Squire Partners, exactly that reason, that it's one thing to look past the documents and the structure when a creditor has negotiated the right to block bankruptcy. To ignore that when the owners retain the decision is silliness. So you start talking about fiduciary duty, and that's just the beginning of the story. I would suggest to you that not only do we not have a fiduciary duty, but we weren't even asked. There's no evidence in this record, nor could there possibly be, that even if we had a fiduciary duty, let's suspend disbelief and pretend that when we made our investment, instead of getting 49.76%, let's pretend we got 52%. Now we're the majority shareholder, right? So we can't, and Your Honor is aware of this from your days in Delaware law, you obviously can't oppress the minority shareholder. That's a given, right? So now we're a majority. Okay, that's great. Now, think about this. We now owe a fiduciary duty. We have to do the right thing for everybody, not just to protect our interests. We've got to protect everyone's interests. Okay, so in that instance, you come to me and say, we really think that this case ought to go into bankruptcy. The company ought to go into bankruptcy. And I say, why? Well, we have this great asset, and their asset is a fanciful case they're going to pursue because they think they were shortchanged in the Hertz transaction. Okay, let's talk about it. I have unique insight into that. I maybe even have sworn statements that explode that idea. Why don't we sit down as true partners, in the sense of we're both part of the same ownership team, and I'll tell you why, A, that case isn't going anywhere. Now let me tell you something else. I put $15 million into this. Maybe I want to do something completely different. Maybe I want to get more money. And by the way, before you decided the last resort, and Tobias Bachteller's testimony was, it's a last resort in bankruptcy. Of course it is, right? No one wants to file bankruptcy if they don't have to. Have you gone to a litigation funding source? You've told us that the greatest asset you have is litigation. There are any number of companies out there that will lend you money against that kind of asset. Have you explored that? That would require you, instead of coming up with a fanciful notion that you have a claim, that would require you actually to convince someone you needed to invest in that claim to do so. Have you done that? No. And that's why when I put Mr. Bachteller on the stand, I asked him, could you have infused cash? Sure we could have. We could have talked about all these options. Okay, well, why didn't you? We were never asked. We got a telephone call the day before saying, we're filing right now. Boom. Over. So the person, Mr. Nash, Jonathan Nash, who's going to oversee the bankruptcy, he's not told that Mr. McDonald has insider deals and he's going to get the benefit of the sale of this YouSave company. We're not told why they want bankruptcy. I ask him, who's the wolf at the door? There's no wolf at the door. Who's the secured creditor? Companies don't willy-nilly walk down the primrose path into bankruptcy. That's not how it works. Bachteller, who's been at this for a long time, says, of course it's such a significant thing, it's such a critical decision, it's so momentous, of course you consider all options, right? Not here. Not when you think the way to the path to the waterfall for you is to have a bankruptcy filing that will enable you to sell yourself an asset. Ask Mr. Nash if he knew about these Tom McDonald insider employment agreements. No. Would you like to have known? I would have, but I didn't. So what's really going on here? It's a very interesting thing. As you go through, and I will tell you that I now know more than I ever really wanted to know about this particular issue, and I take solace from, I think it was Woodrow Wilson on the night before his comprehensive finals at Princeton, he said, my only solace is that this information I've learned will not burden me long. I shall soon forget it. This is exactly how I felt the night of the bar exam. Now I know all this stuff. Guess what's going on? If you're an insider, you get to say, because it's presumed that you're going to do the right thing, why wouldn't you? It's presumed that you're going to act in your interest and that your interests are at least to the tune of 49.76% aligned with the other side. For example, just suppose we were to actually have this lawsuit filed by FISNA against Macquarie. Suppose instead of just filing it willy-nilly, they had come to us and observed that corporate formality, which if that's such material litigation, they should have consulted us according to the Certificate of Incorporate. Suppose they did so. If we won, we FISNA, because we are 49.76% of FISNA, if we won, we'd get 49.76% of the recovery. That's what would happen. That's what goes on. So what are we really talking about here? We're really talking about a falling out between FISNA and Macquarie. When it was everybody's on the same page on deal day, Certificate of Incorporation seemed like a wonderful idea, and that's what we did. It seemed like a wonderful idea because we felt like we could trust one another. I want to say to you at FISNA, listen, I'm going to put this $15 million in, and I'm going to be in with you all the way, profits and losses, distributions and so forth and so on, but I'll tell you what, I don't want you bankrupting the company out from under me. Lexington Group Home, another case. This case has decided, and I don't mean to overwhelm you, these are in our brief, but I do want to point out, September of 2017, the most recent case. It is not to say that members of a business entity cannot freely agree among themselves not to file bankruptcy, and, quote, an agreement forced on members by a creditor solely for its own interest is distinguishable from an agreement among members. The sole issue is whether the bankruptcy restrictions were imposed by PCG as a The court went on to find that's exactly what happened. The restrictions in that case were a necessary part of the loan and so forth. I see my time has expired, but if you have any questions, further questions for me, I'm happy to respond. Thank you, counsel. Thank you. Good luck. The Lexington Hospitality case, which counsel has just read to the court from, is the best case in our favor. In that case, the creditor held a 30% stock interest and was not allowed to exercise a blocking right. The court said that the 30% was controlled by a creditor who owed no fiduciary duty and therefore couldn't exercise the right. We noted in our brief that the 30% stock interest would go away if a loan was paid, but that was not all. If you read the case carefully, the 30% stock interest was subject to a $2 million equity kicker. In other words, mere repayment of the loan was not all that would get rid of that stock interest. It was a valid stock interest, and yet the court said because they're controlled by a creditor who owes no duty to the corporation, the provision is invalid. Now, what's really going on here is that we have a stipulation of a stay pending this court's mandate. So they want this. We asked that this court issue a mandate setting aside the judgment dismissing the bankruptcy. If the court doesn't set aside the judgment dismissing the bankruptcy, we've got a real problem. And that's what this court should do for a couple of reasons. First of all, we're liquefied to this timing thing. This is an appellate fantasy. Boquito's directors were at the meeting where the bankruptcy was voted in. They were there. They abstained. It took them six weeks for Boquito to come in and say, oh, we got this right under 4.4J and we agree with Macquarie that there shouldn't be a bankruptcy. So they didn't object to the bankruptcy at the time. They abstained. They absented themselves. We took the position they were a non-fiduciary and they agreed. They didn't come up with any plan to help the corporation. They didn't say we're going to loan you money so you can sue us. They didn't say we're going to go talk to security creditors, which don't really exist. And with respect to this business about the insider sale, that is exactly why we need bankruptcy. The best way to hold this sale is in bankruptcy court where everything's out, everything's on the table. The bankruptcy judge makes sure it's fair. They raise some business about this employment contract. If there's some problem with the contract, the bankruptcy judge can deal with it. But we can't deal with it if we don't have a bankruptcy. Their objection to the sale terms is a reason for bankruptcy, not a reason against it. Now, they talk about our hypothetical claim. When they filed the motion to dismiss on August 10th, they filed two other motions at the same time. One was a motion to let them continue all their litigation in other courts, and the other was a motion to block us from deposing Mr. Bruce Donaldson, a former Macquarie director who we believe will testify in our favor and is the one who signed the invoice for the $3 million. They say they're ready for discovery. Well, why did they try to block discovery at the same time they filed the motion to dismiss? The reason is they filed the motion to dismiss to defeat the litigation against them now on fiduciary duty, Judge King. The cases are every case that is considered fiduciary duty as a matter of federal law, and we've cited them in our brief, has said that a creditor, shareholder, a shareholder in this situation has a duty to act in the best interest of the corporation. On page 17 of their brief, they say that their shareholder rights should be recognized so they can act in the best interest of the corporation. The bankruptcy court said this deal was designed in the best interest of the corporation. If that is true, then it is only fair to ask them to act like a shareholder in the best interest of the corporation and do that as a matter of federal law to ensure the uniformity that the Constitution says federal bankruptcy law is supposed to have. Now, on Delaware law, Your Honor, the Ivanhoe case, you've got some good law clerks. The Ivanhoe case is cited in their table of contents, but not actually in their brief. It is addressed in the Lynch case that we relied on. It is not contrary to that case. The Lynch case is a refinement which says you go to a particular transaction. And on Delaware law, Judge King, we have cited the Gawala case, which is under Delaware law. When the corporation is insolvent, a duty is owed to all creditors, and it is the duty to all creditors to protect the interests of everybody in the community of interest in this corporation to maximize the value of the corporation, not minimize it. That's why we're here today. We ask the court to reverse the judgment dismissing the bankruptcy and allow us on remand to proceed in bankruptcy. Any question they want to raise about the sale at that time, they're free to raise. If they can figure out a way to get more money, fine. Thank you, counsel. We'll take the matter under advisement. We'll call the next case.